IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KATHERINE HALLOWELL, | : |
| | : |
| Plaintiff, | : CIVIL ACTION NO. _____ |
| | : |
| v. | : |
| | : JURY TRIAL DEMANDED |
| PRIMECARE MEDICAL, INC.; | : |
| GABRIEL PELAEZ; | : |
| WILLIAM S. CATTELL, M.D.; | : |
| PAULA MCGOWEN; | : |
| DOE; | : |
| | : |
| Defendants. | : |

## COMPLAINT

### INTRODUCTION

1. Plaintiff Katherine Hallowell brings this action for damages pursuant to 42 U.S.C. § 1983, against various medical staff at the Berks County Jail System ("BCJS") for depriving her of her rights guaranteed by the Eighth and Fourteenth Amendments of the United States Constitution and Pennsylvania law.

2. While Ms. Hallowell was incarcerated at BCJS in 2020, she received a screening test for cervical cancer. The screening test was positive and indicated the presence of abnormal cells, a result that required additional testing and possible treatment.

3. BCJS medical staff failed to inform Ms. Hallowell of her positive test results, provide her with any additional diagnostic procedures, or include her positive test results in the medical records that accompanied her transfer to a Pennsylvania state prison, and they allowed her to believe that her screening test was negative.

4. In accordance with medical guidelines, Ms. Hallowell did not receive another cervical cancer screening test for three years. By that time she had developed cervical cancer that had metastasized to her neck, lungs, chest, and abdomen.

5. By the time Ms. Hallowell's cancer was diagnosed, it had progressed to the point that her only option was palliative treatment.

6. As a result of the acts and omissions of the defendants, Ms. Hallowell, a 47-year-old woman, has an approximately 80% chance of dying in the next four years from a disease that was preventable and/or diagnosable at a curable stage.

## JURISDICTION AND VENUE

7. Plaintiff brings this action pursuant to 42 U.S.C. § 1983. The Court, therefore, has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)–(4).

8. The Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) to adjudicate Plaintiff's state law claims.

9. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims occurred in Berks County, Pennsylvania, which is in the Eastern District of Pennsylvania.

## PARTIES

10. Plaintiff Katherine Hallowell is a 47-year-old adult individual who is currently incarcerated at the Pennsylvania State Correctional Institution at Muncy (SCI Muncy) and was previously incarcerated at BCJS from March 2019 through June 2020.

11. Defendant PrimeCare Medical, Inc. ("PrimeCare"), which has a principal place of business in Harrisburg, PA, was, at all times relevant to this case, the holder of a contract with Berks County to provide medical care to people incarcerated at BCJS.

12. Defendant Gabriel Pelaez worked at BCJS as a physician assistant during all times relevant to this case, and, upon information and belief, he was an employee of PrimeCare. He was licensed as a Medical Physician Assistant by the Pennsylvania Board of Medicine from August 23, 2018 through December 31, 2022.

13. Defendant William S. Cattell worked at BCJS and provided supervision to Defendant Pelaez during all times relevant to this case and, upon information and belief, he was an employee of PrimeCare. He has been licensed as a Medical Physician and Surgeon by the Pennsylvania Board of Medicine since 1996.

14. Defendant Paula McGowen worked at BCJS as a nurse practitioner during all times relevant to this case and, upon information and belief, she was an employee of PrimeCare.

15. Defendant Doe worked at BCJS as a Health Services Administrator during all times relevant to this case and, upon information and belief, Doe was a registered nurse and an employee of PrimeCare Medical, Inc.

## STATEMENT OF FACTS

16. Ms. Hallowell was a pretrial detainee at BCJS from March 2019 until May 28, 2020.

17. On May 28, 2020, she entered a guilty plea in the Court of Common Pleas of Berks County and was sentenced to eight to twenty years in prison.

18. She remained incarcerated at BCJS until June 25, 2020, when she was transferred to the custody of the Pennsylvania Department of Corrections.

19. While at BCJS, Ms. Hallowell received medical care from Defendant Pelaez, a physician assistant who practiced medicine under the supervision of a physician, Defendant Cattell.

20. Under Pennsylvania law, Defendant Pelaez was only permitted to perform duties and responsibilities, including diagnostic procedures, at Defendant Cattell's direction and under his supervision, in accordance with the standard of care. *See* 49 Pa. Code § 18.151(a)–(b).

21. Under Pennsylvania law, Defendant Pelaez was considered Defendant Cattell's agent in the performance of all practice-related activities. *See id.* § 18.151(d).

22. On March 27, 2020, Defendant Pelaez scheduled a pap test for Ms. Hallowell for April 17, 2020.

23. On April 17, 2020, Defendant Pelaez collected a cervical specimen from Ms. Hallowell for a Human Papillomavirus (HPV) test and ThinPrep Pap Test, tests used to screen for cervical cancer.[1]

24. Defendant McGowen participated in the collection of Ms. Hallowell's cervical specimen by providing instructions to Defendant Pelaez as to how to place the speculum and collect cervical cells for the test sample, and otherwise assisting Defendant Pelaez.

25. Defendant Pelaez told Ms. Hallowell that if she did not receive any notification of her pap test results, she should assume that the results were negative, and no additional follow-up care was needed.

26. Defendant McGowen heard Defendant Pelaez tell Ms. Hallowell that if she did not receive any notification of her pap test results, she should assume that the test results were negative and no additional follow up care was needed.

---

[1] *See* American Cancer Society, *HPV Testing*, https://www.cancer.org/cancer/risk-prevention/hpv/hpv-and-hpv-testing.html (last visited Oct. 7, 2024); ARUP Laboratories, *Cytology, ThinPrep Pap Test*, https://ltd.aruplab.com/Tests/Pub/2000137 (last visited Oct. 7, 2024).

27. On April 23, 2020, BioReference Laboratories created a report of Ms. Hallowell's cervical cancer screening test results, which was promptly provided to PrimeCare staff at BCJS.

28. The report indicated the presence of high-risk cervical HPV infection and a pap test result of "atypical squamous cells; cannot exclude a high grade squamous intraepithelial lesion (ASC-H)."

29. A positive HPV test alone is sufficient to trigger the need for follow-up care such as additional testing.[2]

30. A finding of ASC-H, a result found in less than 1% of pap tests,[3] meant that Ms. Hallowell had cervical cells that were abnormal and urgently required follow-up care.[4]

31. The combination of a positive HPV test result and a finding of ASC-H placed Ms. Hallowell in an extremely high-risk category for developing cervical cancer.[5]

32. Any competent medical professional would be aware that pursuant to national guidelines and standards, Ms. Hallowell's cancer screening test results signaled a pressing need for additional medical care.[6]

---

[2] *See* Centers for Disease Control and Prevention, *HPV-Associated Cancers and Precancers*, https://www.cdc.gov/std/treatment-guidelines/hpv-cancer.htm (last visited Oct. 7, 2024).

[3] Diane Davis Davey et al., *Atypical Squamous Cells, Cannot Exclude High-Grade Squamous Intraepithelial Lesion: Review of Ancillary Testing Modalities and Implications for Follow-up*, 14(3) J. of Lower Genital Tract Disease 206 (2010).

[4] *See* American Cancer Society, *The Pap (Papanicolaou) Test: Squamous cell abnormalities*, https://www.cancer.org/cancer/types/cervical-cancer/detection-diagnosis-staging/screening-tests/pap-test.html (last visited Oct. 7, 2024).

[5] Rebecca B. Perkins et al., *Summary of Current Guidelines for Cervical Cancer Screening and Management of Abnormal Test Results: 2016-2020*, 30(1) J. of Women's Health 5, 11-12 (2021).

[6] *Id.*

33. The standard of care dictates that any medical professional ordering a diagnostic test like a pap should know what results are abnormal and/or warrant additional follow-up tests or treatment.

34. The American Society for Colposcopy and Cervical Pathology (ASCCP) 2019 guidelines recommend colposcopy or "expedited treatment" for individuals with the combination of a positive HPV test and pap test results of ASC-H.[7]

35. The ASCCP is a professional society focused on the study, prevention, diagnosis, and management of anogenital and HPV-related diseases.

36. ASCCP's 2019 guidelines have been endorsed by The American College of Obstetricians and Gynecologists.[8]

37. Colposcopy requires "close examination of the cervix using magnification and usually multiple biopsies of the cervical transformation zone."[9]

38. The ASCCP defines "expedited treatment" as "proceeding directly to an excisional treatment . . . without requiring a confirmatory colposcopic biopsy."[10]

---

[7] *Id.* at 11.

[8] *See* American College of Obstetricians and Gynecologists, *Updated Guidelines for Management of Cervical Cancer Screening Abnormalities*, https://www.acog.org/clinical/clinical-guidance/practice-advisory/articles/2020/10/updated-guidelines-for-management-of-cervical-cancer-screening-abnormalities#:~:text=ASCCP%20recently%20released%20its%20Risk,Results%20and%20Cervical%20Cancer%20Precursors (last visited Oct. 7, 2024).

[9] Perkins, *supra* note 5, at 9.

[10] *Id.* at 10.

39. In this context, excisional treatment refers to the removal of abnormal tissue from the cervix and cervical canal.[11]

40. Defendants Pelaez and McGowen had a duty to inform Ms. Hallowell of her cancer screening test results and ensure that she received the medical care necessitated by those results.

41. Defendants Pelaez and McGowen were aware of the results of Ms. Hallowell's cancer screening test or, in the alternative, they failed to review the results despite having a duty to do so.

42. Defendants Pelaez and McGowen failed to notify Ms. Hallowell of her cancer screening test results and they knew that their failure to do so would cause Ms. Hallowell to believe that her test results were negative.

43. Defendants Pelaez and McGowen took no actions to facilitate Ms. Hallowell receiving the medical care her cancer screening test results necessitated.

44. Defendant Cattell failed to ensure that Defendant Pelaez delivered adequate medical care, failed to ensure that Ms. Hallowell received notification of her cancer screening test results, and failed to ensure that she received the additional care necessitated by those test results.

45. On June 25, 2020, Ms. Hallowell was transferred to SCI Muncy.

46. The terms of Berks County's contract with PrimeCare required that PrimeCare make available "[a] complete legible copy of the applicable medical record . . . to accompany each inmate who is transferred from the Jail System to another location for off-site services or transferred to another institution."

---

[11] National Cancer Institute, *HPV and Pap Test Results: Next Steps after an Abnormal Cervical Cancer Screening Test*, https://www.cancer.gov/types/cervical/screening/abnormal-hpv-pap-test-results (last visited Oct. 7, 2024).

47. When Ms. Hallowell was transferred to SCI Muncy, the highly concerning results of Ms. Hallowell's cancer screening test were not shared with the Pennsylvania Department of Corrections, SCI Muncy, or the DOC's medical contractor.

48. In their capacity as Health Services Administrator, Defendant Doe failed to ensure that Ms. Hallowell's cancer screening test report was transferred to SCI Muncy in June 2020.

49. As a registered nurse, Defendant Doe knew of the importance of including Ms. Hallowell's cancer screening test report within her medical record.

50. Because Ms. Hallowell received no notification of her cancer screening test results or additional treatment recommendations, she believed that her test results were negative.

51. After arriving at SCI Muncy, Ms. Hallowell was offered a pap test and refused it on the basis that she had recently received a pap test at BCJS and the results of that test were normal.

52. ThinPrep Pap Tests are approved by the U.S. Food and Drug Administration for routine cervical cancer screening at three-year intervals in all women greater than twenty-one years of age.[12]

53. Because Ms. Hallowell and SCI Muncy medical staff believed that Ms. Hallowell had received a negative result on her 2020 pap test and had no records from BCJS indicating otherwise, Ms. Hallowell was not offered another pap test for three years.

54. On July 12, 2023, medical staff at SCI Muncy collected a cervical sample from Ms. Hallowell as part of a routine exam and submitted the sample for a ThinPrep Pap Test.

55. The results of this test were positive for atypical cells.

---

[12] *See* ARUP Laboratories, "Cytology, ThinPrep Pap Test," https://ltd.aruplab.com/Tests/Pub/2000137 (last visited Oct. 7, 2024).

56. On August 21, 2023, Dr. Marc Landsberg at SCI Muncy performed a colposcopy on Ms. Hallowell, which resulted in a diagnosis of cervical cancer.

57. At the time of her colposcopy, Ms. Hallowell and Dr. Landsberg believed that her 2020 cancer screening test had been negative.

58. In August 2023, SCI Muncy medical staff requested Ms. Hallowell's 2020 cancer screening test results from BCJS.

59. In their capacity as Health Services Administrator, Defendant Doe, or the individual then serving as BCJS's Health Services Administrator, failed to ensure that SCI Muncy's request for Ms. Hallowell's 2020 cervical cancer screening test report was addressed in a timely manner.

60. On November 20, 2023, after multiple requests from SCI Muncy staff, BCJS staff faxed the results of Ms. Hallowell's 2020 cervical cancer screening test to SCI Muncy.

61. In November 2023, Ms. Hallowell was diagnosed with Stage 4B metastatic cancer of the cervix that had spread to lymph nodes in her neck, lungs, chest, and abdomen.

62. If Defendants had provided Ms. Hallowell with timely notification of her 2020 cancer screening test results and provided timely medical care in accordance with ASCCP guidelines, her risk of developing cervical cancer would have been reduced by 95%.[13]

63. If Defendants had rectified their initial failure by providing Ms. Hallowell's cancer screening results to her at some point during the three years following her test, thus allowing her

---

[13] Cleveland Clinic, "Cervical Dysplasia," https://my.clevelandclinic.org/health/diseases/15678-cervical-intraepithelial-neoplasia-cin (last visited Oct. 7, 2024).

cervical cancer to be diagnosed at an early stage, she would have likely had a five-year relative survival rate of 91%.[14]

64. Because Defendants did not provide Ms. Hallowell's 2020 cancer screening test results to her until over three years after the screening test, at which time the cancer had already spread throughout her body, her five-year relative survival rate is 19%.[15]

65. Stage 4B metastatic cancer of the cervix is not curable.[16]

66. The medical treatments Ms. Hallowell has received and continues to receive are directed at extending her life and making her more comfortable, but she has limited time left to live, and what time remains will be marked by increasing pain, weakness, and disability.

67. Ms. Hallowell began receiving palliative radiation, chemotherapy, and immunotherapy treatments in December 2023, which caused her to experience side effects including nausea, fatigue, vomiting, diarrhea, and loss of appetite.

68. She completed her radiation and chemotherapy treatments in the Spring of 2024, but may require additional radiation and/or chemotherapy in the future depending on the progression of her cancer condition.

69. She continues to receive infusions of immunotherapy medications approximately every three weeks and will do so for the rest of her life.

---

[14] National Cancer Institute, "Cervical Cancer Prognosis and Survival Rates," https://www.cancer.gov/types/cervical/survival#:~:text=When%20cervical%20cancer%20is%20 diagnosed,relative%20survival%20rate%20is%2060%25 (last visited Oct. 7, 2024).

[15] *Id.*

[16] American Cancer Society, "Treatment Options for Cervical Cancer, by Stage," https://www.cancer.org/cancer/types/cervical-cancer/treating/by-stage.html (last visited Oct. 7, 2024).

70. The immunotherapy medications cause her to feel significant pain in her muscles, joints and bones, along with exhaustion, nausea, persistent chills, loss of appetite, an ongoing rash on her arm, and numbness in her extremities.

71. Although she takes OxyContin every day, she continues to experience pain that is centered in her pelvis and which radiates throughout her body.

72. Prior to her illness, Ms. Hallowell enjoyed working in the kitchen at SCI Muncy and also spent many hours in the garden attached to the Veteran's Housing Unit where she lives, helping to grow thousands of pounds of vegetables that she and her peers donated to the Central Pennsylvania Food Bank.

73. Since beginning treatment for her cancer, Ms. Hallowell has been unable to work in the kitchen and has had to significantly limit other activities that require physical exertion.

74. Cancer and the side effects of her medical treatment have caused her countless hours of severe nausea, taken her waist-length hair from her, and erased her energy and enjoyment of physical activity.

75. She is no longer able to walk around the prison without assistance and requires frequent rests throughout the day.

76. Ms. Hallowell will be eligible for parole in March 2027.

77. At best, she will be returning to her community with little ability to engage in employment or care for herself and with significant ongoing needs for medical care.

78. She maintains close relationships with her teenage son, sister, and parents, all of whom are grieving her eventual loss.

79. Before her cancer diagnosis, Ms. Hallowell looked forward to a future in which she could ride her motorcycle again, take her son camping, and enjoy visits to the zoo and botanical gardens with her family.

80. She now has to plan for a future in which her son, whose father died in 2017, will have no living parents.

81. She cycles through sadness, depression, and anger on a daily basis.

82. Living with the knowledge that her cancer will kill her and the uncertainty of how quickly the spread of cancer throughout her body will progress is devastating.

83. Defendants' failures have taken her future from her and given her a present existence dominated by pain, exhaustion, and grief.

## CAUSES OF ACTION

### Count I: 42 U.S.C. § 1983 – Eighth and Fourteenth Amendments
### Plaintiff v. Defendants Pelaez, Cattell, McGowen, and Doe

84. The allegations set forth in each of the preceding paragraphs are incorporated herein by reference.

85. Defendants' acts and/or omissions were objectively unreasonable and exhibited deliberate indifference to Ms. Hallowell's serious medical needs and the substantial risk of serious harm, including premature, preventable death.

86. Defendants' acts and/or omissions caused Ms. Hallowell to develop untreatable cancer that is causing her unnecessary pain and suffering and will lead to her premature death.

### Count II: Professional Negligence and Vicarious Liability under Pennsylvania Law
### Plaintiff v. All Defendants

87. The allegations set forth in each of the preceding paragraphs are incorporated herein by reference.

88. At all relevant times, the individual Defendants had a duty to act in accordance with the standard of care required of medical professionals and to act as a reasonable person would under the same or similar circumstances.

89. Defendant Pelaez breached his duty as a physician assistant when he failed to inform Ms. Hallowell of her positive test results, failed to provide her with additional diagnostic procedures, and allowed her to believe that her screening test was negative.

90. Defendant Cattell breached his duty as a physician when he failed to adequately supervise Defendant Pelaez, failed to ensure that Ms. Hallowell was informed of her positive test results, failed to provide her with additional diagnostic procedures, and allowed her to believe that her screening test was negative.

91. Defendant McGowen breached her duty as a nurse practitioner when she failed to inform Ms. Hallowell of her positive test results, failed to provide her with additional diagnostic procedures, and allowed her to believe that her screening test was negative.

92. Defendant Doe breached the duty as a nurse by failing to include Ms. Hallowell's positive test results in her medical record and failing to provide those test results to SCI Muncy in a timely manner.

93. As a result of the individual Defendants' acts and omissions, Ms. Hallowell developed untreatable cancer that is causing her unnecessary pain and suffering and will lead to her premature death.

94. Defendant PrimeCare Medical, Inc. is vicariously liable for the negligence of its employees, Defendants Pelaez, Cattell, McGowen, and Doe.

95. Defendant Cattell is vicariously liable for the negligence of Defendant Pelaez. *See* 49 Pa. Code § 18.151(d).

**Count III: Negligence under Pennsylvania Law**
**Plaintiff v. Defendants Doe and PrimeCare Medical, Inc.**

96. The allegations set forth in each of the preceding paragraphs are incorporated herein by reference.

97. At all relevant times, Defendant Doe, as Health Services Administrator, owed a duty to Ms. Hallowell to ensure that her medical records were properly maintained and transmitted to the prison to which she was transferred.

98. Defendant Doe, breached the medical duty to Ms. Hallowell by failing to provide her with her complete medical record and failing to ensure that Ms. Hallowell's complete medical record accompanied her at the time of her institutional transfer.

99. Defendant Doe's acts and omissions were a substantial factor in causing Ms. Hallowell to develop untreatable cancer that is causing her unnecessary pain and suffering and will lead to her premature death.

100. Defendant PrimeCare Medical, Inc, is vicariously liable for Defendant Doe's negligence.

## REQUESTED RELIEF

WHEREFORE, Plaintiff Katherine Hallowell respectfully requests that the Court grant the following relief:

A. An award of compensatory and punitive damages against all Defendants in an amount to be determined by the finder of fact;

B. Reasonable attorney's fees and costs; and

C. Such other relief the Court deems just and proper.

Respectfully submitted,

*/s/ David Rudovsky*
David Rudovsky (PA 15168)
KAIRYS, RUDOVSKY, MESSING,
FEINBERG, & LIN, LLP
718 Arch Street, Suite 501S
Philadelphia, PA 19106
215-925-4400
drudovsky@krlawphila.com

*/s/ Matthew A. Feldman*
Matthew A. Feldman (PA 326273)
PA INSTITUTIONAL LAW PROJECT
718 Arch Street, Suite 304S
Philadelphia, PA 19106
215-925-2966
mfeldman@pilp.org

*/s/ Evangeline Wright*
Evangeline Wright (PA 200054)
PA INSTITUTIONAL LAW PROJECT
115 Farley Circle, Suite 110
Lewisburg, PA 17837
570-661-9044
ewright@pilp.org

*Counsel for Plaintiff*

DATE: October 29, 2024